# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 C 9588 | DATE | 11/8/2002 |
| CASE TITLE | Szymanski v. County of Cook | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Plaintiff's and Defendant's Cross-Motions for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached memorandum opinion and order, the Plaintiff's and Defendant's Motions for Summary Judgment [12-1], [10-1] are DENIED in their entirety.

*/s/ David H. Coar*

(11) ■ [For further detail see attached memorandum opinion and order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | NOV 08 2002 | |
| | Notified counsel by telephone. | | date docketed | 32 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | | |
| | Copy to judge/magistrate judge. | | | |
| | mds(lc) courtroom deputy's initials | 02 NOV -8 PM 12:46 date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| EVELYN J.D. SZYMANSKI, | ) |
| Plaintiff, | ) No. 01 C 9588 |
| | ) |
| v. | ) HONORABLE DAVID H. COAR |
| | ) |
| COUNTY OF COOK | ) |
| Defendant. | ) |

DOCKETED
MAY 0 8 2002

## MEMORANDUM OPINION AND ORDER

Evelyn J.D. Szymanski ("Szymanski" or "Plaintiff") brings a retaliation action against her employer, County of Cook ("Defendant") pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*. Szymanski alleges that Defendant unlawfully retaliated against her for filing discrimination charges with the EEOC and for bringing a federal discrimination lawsuit against it.[1] Before this Court are plaintiff Szymanski's and Defendant County's cross motions for summary judgment. For the reasons stated below, this Court DENIES Plaintiff's and Defendant's motions for summary judgment in their entirety.

### I. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Michael v. St. Joseph County, et. al., 259 F.3d 842, 845 (7th Cir. 2001). A

---

[1] That case, Szymanski v. County of Cook, No. 00 C 4737, also was tried before this Court.

genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); Eiland v. Trinity Hosp., 150 F.3d 747, 750 (7th Cir. 1998).

The movant bears the burden of establishing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995). If the movant meets this burden, the non-movant must set forth specific facts that demonstrate the existence of a genuine issue for trial. Rule 56(e); Celotex, 477 U.S. at 324, 106 S. Ct. at 2553. Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant must respond to the motion with evidence setting forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P 56(e); Michael, 259 F.3d at 845; Albiero v. City of Kankakee, 246 F.3d 927, 932 (7th Cir. 2001). To successfully oppose the motion for summary judgment, the non-movant cannot rest on the pleadings alone, but must designate *specific facts* in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue. Selan v. Kiley, 969 F.2d 560, 564 (7th Cir. 1992). A scintilla of evidence in support of the non-movant's position is insufficient, and the non-movant "'must do more than simply show that there is some metaphysical doubt as to the material fact.'" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)); see also Anderson, 477 U.S. at 250, 106 S. Ct. at 2511. Weighing evidence, determining credibility, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. Anderson, 477 U.S. at 255, 106 S. Ct. at 2515.

On cross-motions for summary judgment, each movant must individually satisfy the requirements of Rule 56. Great West Cas. Co. v. Rogers Cartage Co., No. 00 C 6621, 2001 WL 1607608, at *1 (N.D. Ill. 2001); Proviso Ass'n of Retarded Citizens v. Village of Westchester, 914 F. Supp. 1555, 1560 (N.D. Ill. 1996). Thus, the traditional standards for summary judgment still apply even though both parties have moved for summary judgment. Blum v. Fisher and Fisher, Attorneys at Law, 961 F. Supp. 1218, 1222 (N.D. Ill. 1997). This Court thus considers the merits of each cross-motion separately and draws all reasonable inferences and resolves all factual uncertainties against the party whose motion is under consideration. O'Regan v. Arbitration Forums, Inc., 246 F.2d 975, 983 (7th Cir. 2001). This "Janus-like perspective . . . sometimes forces the denial of both motions," but only where there are material facts in dispute. Buttitta v. City of Chicago, 803 F. Supp. 213, 217 (N.D. Ill. 1992).

## II. Background

The following facts are taken from the parties' Local Rule 56.1(a)(3) and (b)(3) Statement of Material Facts.[2] Szymanski, a resident of Westchester, Illinois, began her employment with Defendant at Cook County Hospital on January 3, 1983 as a licensed Nurse Practitioner in the Ambulatory Screening Clinic ("ASC"). As of July 13, 2001, there were four

---

[2] Unless otherwise indicated by a showing of disagreement, the facts listed below are undisputed. This Court disregarded responses or portions of responses that either 1) were unsupported by the portion of the record cited or 2) improperly contained argument instead of concise admissions or denials, as required by Local Rule 56.1, which this Court strictly enforces. Further, statements and responses that are not supported by the record are disregarded. See Johnson v. Indopco, Inc., 887 F.Supp. 1092, 1095 (N.D. Ill. 1995). "[A] lawsuit is not a game of hunt the peanut. Employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." Greer v. Bd. of Educ., 267 F.3d 723, 727 (7th Cir. 2001).

nurse practitioners in the ASC: Szymanski, Shirley Muse-Blackstone, Michelle Coleman, and Cynthia Williams.

Dr. Than Win ("Dr. Win") became the Director of the ASC in January 2000. Dr. Win was aware of Szymanski's several EEOC filings, and he also was aware that Szymanski had identified him as a responsible management official in her disparate pay and retaliation charges filed with the EEOC in early 2000. Further, Dr. Win participated in pre-trial discovery and testified in Szymanski's initial federal trial held on April 1-3, 2002.

Dr. John Raba is, and was at all times relevant, the Co-Medical Director of the ASC and Medical Director of the Fantus Health Center ("Fantus"). Dr. Raba acted as Dr. Win's immediate supervisor. Dr. Raba also was aware that Szymanski had filed EEOC charges against the Defendant.

Polices and Procedures Regarding Eligibility for Nurse Practitioners in the ASC

Under the Illinois Nursing and Advanced Practice Act, all Nurse Practitioners practicing in Illinois must have a written "Collaborative Agreement" (also referred to as "Supervision Document") with a physician that conforms to the requirements of the Act. This requirement applied to all Nurse Practitioners in the ASC in July 2001. Pursuant to this requirement, by January 3, 2002, the Cook County Bureau of Health Services (the "Bureau") finalized and put into effect a policy (the "Bureau Policy") specific to Advanced Practice Nurses, including Nurse Practitioners, employed by affiliates of the Bureau. This policy is the only bureau-wide policy regarding collaborative agreements between physicians and mid-level practitioners. The Bureau Policy contained the Bureau's requirements regarding approval of Bureau Mid-Level Practitioners ("MLPs") practicing with Bureau health facilities and programs, and it has been

implemented within each Bureau Affiliate, including Cook County Hospital and the Cook County Ambulatory and Community Health Network.

Under the policy, Nurse Practitioners are considered Bureau MLPs. Further, "Bureau Physician" refers to a licensed physician who provides medical services within Bureau health facilities and who has been approved by the Medical Director of the Affiliate and the Chairperson of the department within which he or she provides services to provide medical direction and oversight to a Bureau MLP pursuant to a Supervision Document within Bureau facilities and programs. Only Bureau Physicians who have been approved by the Medical Director of the relevant Affiliate are permitted to enter into Supervision Documents. Notwithstanding any determination by the MLP Committee that an MLP is eligible, and notwithstanding approval by the Affiliate Credentials Committee to practice pursuant to a Supervision Document, Bureau Physicians are not obligated to enter into or to maintain a Supervision Document.

The Bureau Policy provides that MLPs seeking to practice within Bureau Affiliates must submit (through the Medical Director) to the Bureau MLP Committee evidence of the qualifications and a Supervision Document signed by a Bureau Physician. In those instances where a Bureau Physician refuses to renew or otherwise limit the scope of a collaborative agreement with an MLP, such physician must: a) notify the MLP Committee in writing of such action and b) provide immediate written notification to the Chair of the MLP Committee and the Affiliate Credentials Committee. Upon being advised of such nonrenewal or limitation of a collaborative agreement, the MLP Committee reviews the information and determines whether it wishes to limit or terminate the eligibility of an MLP. The MLP Committee may adopt

procedures for the review and investigation of such matters, including a procedure for conducting a hearing in the event that it intends to reduce or terminate the eligibility of an MLP to practice within Affiliates pursuant to a Supervision Document.

The Bureau Policy further provides that a Bureau Physician delegating collaborative and prescriptive privileges to an MLP under a Collaborative Agreement must, at a minimum, a) participate in the formulation of guidelines and privileges included in such agreement; b) be on the site at least once a month to provide the MLP with direction, consultation, and oversight; c) be available through telecommunication with the MLP for consultation on medical problems, complications, or emergencies; and d) arrange for an alternate physician at times when the collaborative physician is otherwise unavailable.

Szymanski's Employment

During November 2000, the Cook County Joint Conference Committee ("JCC") recommended Szymanski's continued employment as a Nurse Associate in the Department of Medicine, Division of General Medicine for the period of November 1, 2000 through November 2002. According to Dr. Win, the JCC is specifically authorized to review the credentials of Nurse Associates and make recommendations concerning their continued employment.

Each Affiliate must adopt a policy that is consistent with the provisions of the Bureau Policy. In the event that an Affiliate does not adopt a policy, the Bureau's Policy serves as that Affiliate's policy. Fantus, under the direction of Dr. Raba, utilized the Bureau Policy as its policy for the ASC in which Szymanski worked. According to the Bureau Policy, a Collaborating Physician can supervise no more than two MLPs. This policy was the only written

-6-

policy in effect at the time Szymanski was suspended.[3] Under the Fantus/ASC guidelines, there are approximately 25 to 30 physicians that would have been qualified and acceptable to act as a collaborating physician with Szymanski. Of those physicians, Szymanski had a close working relationship with 5 or 6.

On July 13, 2001, Dr. Than Win signed an "Advanced Practice Nurse/Bureau Physician Collaborative Practice Agreement" for all four nurse practitioners in the ASC, including Szymanski. In March 2002, however, Dr. Win became aware that, under the Bureau Policy, he could only serve as a collaborative physician to two Nurse Practitioners. Dr. Win already signed prescriptive authority documents with Nurse Practitioners Michelle Coleman and Shirley Muse-Blackstone, so he informed Szymanski and Cindy Williams that he would no longer be able to serve as their collaborative physician. In March 2002, Dr. Raba informed Szymanski by letter that Dr. Win could no longer serve as her collaborative physician and that she would have to identify another physician by April 5, 2002.[4]

On or about March 20, 2002, Szymanski advised Dr. Raba that Dr. Frank Parker had agreed to act as her collaborative physician. Dr. Parker has been a full-time staff physician in the ASC for five years, and he has evaluated Szymanski's clinical performance as a Nurse Practitioner in the ASC. After receiving notice of Dr. Parker's willingness to be Szymanski's collaborative physician, Dr. Raba called Dr. Parker to his office. Dr. Raba informed Dr. Parker

---

[3] In addition to the Bureau Policy, however, at some point during the spring of 2002, Fantus adopted guidelines that contained additional criteria a Bureau Physician had to meet in order to serve as a Collaborating Physician to an MLP. One criterion is that a Collaborating Physician must "routinely and regularly work[]" in the clinic in which the MLP works.

[4] This notification came approximately two weeks before Szymanski's jury trial on April 1-3, 2002.

that he was not qualified to act as Szymanski's collaborative physician.[5] On March 22, 2002, Szymanski informed Dr. Raba in writing that Dr. Washy Ahmed had agreed to act as her collaborating physician. Dr. Ahmed, however, did not agree to act as Szymanski's collaborating physician. He initially told her that he was not sure and that he needed to check into it. He then had some communication with Dr. Win and decided not to serve as Szymanski's collaborating physician. His stated reason was that he did not want to be a collaborative physician because he was employed as a service physician at an hourly rate. On April 12, 2002, Dr. Ahmed submitted a letter to Dr. Raba stating:

> I am writing this letter to inform you that I have never consented to give my name as a collaborative physician for a nurse practitioner's license. I would like to put a few facts straight for the record. On Friday, March 22, 2002, when I returned from Ground Rounds, Miss. Szymanski asked me, "will you sign my Collaborative Physicians Form?" I replied, "I'm not sure what you are talking about and which form you are speaking of?" I also told her, "let me find out more about it then I'll tell you whether I will sign it or not." After that, I went to the Core Center in order to continue work. When I returned, I went to Dr. Than Win's office to find out about it. There I came to know that Miss. Szymanski wrote a letter to Dr. Raba that I have promised her to sign the collaborative form, which was a surprise to me. On Monday morning, I saw Miss. Szymanski in ASC and she asked about it. She then said "Oh that's fine." Then I told her to write a letter to Dr. Raba regarding this issue, that I have never consented, in order to rectify the issue. She then said, "If you don't want to sign it's o.k. I understand it, we can still be friends." Then she walked out of the area.

Sometime in March 2002, Szymanski asked Dr. Manish Brahmbhatt if he would act as her collaborative physician and sign a Collaborative Agreement with her. Shortly thereafter, Dr.

---

[5] The record is not clear whether Dr. Raba used the word "unqualified" in speaking with Dr. Parker. Dr. Raba said that he told Dr. Parker that, as a rehab doctor, Dr. Parker was not trained in the clinical field that staffs the ASC, and he therefore was not qualified to train Szymanski. It was Dr. Parker's understanding that Dr. Raba wanted someone in internal medicine to serve as Szymanski's collaborative physician, and he said that this made sense to him. Dr. Parker also believed that Dr. Raba would "check" into getting someone from internal medicine.

Raba spoke with Dr. Brahmbhatt on the phone and Dr. Brahmbhatt indicated to Dr. Raba that he did not want to be Szymanski's collaborative physician.[6] On April 8, 2002, Szymanski was suspended for not having a signed collaborative agreement, and she was notified that a hearing would be held on April 23, 2002 to discuss her situation.

On April 23, 2002, Szymanski informed Dr. Raba that Dr. Glenn Harrison had agreed to act as her collaborative physician, and she submitted a Collaborative Agreement signed by Dr. Harrison.[7] Dr. Harrison is an Internist on staff at the Department of Medicine and Dr. Win admitted that Dr. Harrison's signed Collaborative Agreement satisfied each and every requirement contained in the Bureau Policy. Dr. Raba, however, did not allow Dr. Harrison to act as Szymanski's collaborative physician because Dr. Harrison does not work in the Fantus Clinic; rather, Dr. Harrison works at the Woodlawn Health Center, which is several miles away. Dr. Harrison would not be allowed to see patients in the Fantus Clinic without the approval of

---

[6] On April 19, 2002, Dr. Brahmbhatt submitted a letter to Dr. Raba that stated:
Last month (March), Miss Evelyn Szymanski asked me to sign her collaborative agreement form for advance nurse practitioner. I told her that I would need to find out more information regarding this from the Director of Cook County Hospital. After finding out, I decided not to sign her form.
On 3/30/02 - Saturday, Miss Evelyn Szymanski paged me. I told her that I can not sign her collaborative agreement form and asked her to find another physician for the same.

Dr. Brahmbhatt did not want to be a collaborative physician because he was an hourly paid physician. He previously acted as a collaborative physician for Cindy Williams, but that was only for two months.

[7] Defendant disputes this fact, arguing that the Plaintiff did not offer proper support. The Plaintiff submitted, however, a letter dated April 23, 2002 stating that she obtained a Collaborative Agreement with Dr. Harrison, and a Collaborative Agreement that appears to be signed by both Szymanski and Dr. Harrison.

-9-

the medical director and he therefore was not able to enter into a Collaborative Agreement without the approval of the medical director. In fact, no Nurse Practitioner in the Fantus Clinic/ASC under the direction of Dr. Raba has a Bureau Physician employed outside of the Fantus Clinic/ASC as a collaborative physician.

Szymanski was discharged on April 23, 2002 because she was unable to obtain a collaborative agreement with a physician. Dr. Raba stated that he has "signed off" on every collaborative agreement submitted by Nurse Practitioners in the ASC with the sole exception of Szymanski's signed agreement. While Dr. Raba discussed Szymanski's ineligibility with Linda Strickland (a member of either the MLP Committee or the Credentials Committee), he did not forward the decision to terminate Szymanski for lack of eligibility to either of these Committees. It was Dr. Raba's understanding that it was not necessary to notify the MLP or Credentials Committees in situations where a nurse practitioner failed to meet the basic requirements of the Advanced Nurse Practice Act. Rather, as he understood it, only in situations where adverse actions were the cause of the suspension of privileges was it necessary to notify the committees.

On June 19, 2002, Szymanski sent a request to Ruth Rothstein for a hearing before the Credentials Committee regarding her termination. On July 22, 2002, Szymanski's counsel sent a second request for a hearing to the Credentials Committee regarding Szymanski's eligibility to continue her employment at Cook County.[8]

---

[8] At some point prior to her termination, Szymanski had been falsely accused of not performing patient interviews and Dr. Rahim told her that Cook County was "creating a file on her." No action, however, was taken against Szymanski as a result of this alleged surveillance, nor was she disciplined for failing to perform patient interviews.

-10-

Besides Szymanski, two other Nurse Practitioners have been suspended and/or terminated for not having a collaborative agreement: Mary Lesnik and Kathy Antunovich. Lesnik has filed EEOC charges against Defendant. Specifically, she filed EEOC case number 2002CF0037 against Defendant on July 12, 2001. Further, Lesnik was listed as one of Szymanski's witnesses in Szymanski's first federal lawsuit tried April 1-2, 2002. Lesnik was discharged effective October 19, 2001. Lesnik, a Nurse Practitioner employed in the Department of Nephrology, was under the supervision of Dr. George Dunea. Dr. Raba had no firsthand knowledge or involvement with Lesnik's situation.

Antunovich was discharged on May 1, 2002. Antunovich currently has a Title VII retaliation case pending in the United States District Court, Northern District of Illinois. At the time of her termination, Antunovich had three signed collaborative agreements on file. The first collaborative agreement was with Dr. Michael McDermott, dated July 11, 2001; the collaborative agreement signed by Dr. James Calvin, who was unable to continue serving as her collaborative physician when he ceased working at the ASC full time, is dated August 2, 2002; and the third collaborative agreement was with Dr. Franklin Saksena, dated April 26, 2002. Antunovich, a Nurse Practitioner employed in the Department of Cardiology, was not under the supervision of Dr. Raba, but she was paid out of the ambulatory budget. Dr. Raba had no input into the decision-making process regarding the proposed collaborative agreements or the decision to discharge Antunovich.

Szymanski's EEOC Activity

On January 31, 2000, Szymanski filed a discrimination charge against the Defendant with the Equal Employment Opportunity Commission ("EEOC"). On April 3, 2000, Szymanski

amended her EEOC charge to include a claim of retaliation. Specifically, Szymanski alleged that she was segregated from her coworkers, denied access to her patients, and reassigned to clean patient education files in retaliation of her EEOC activity. On June 21, 2000, Szymanski filed another EEOC charge against Defendant alleging that she had been assigned to "health risk housekeeping duties not covered by her job description" in retaliation of her EEOC activity. On August 4, 2000, Szymanski filed a complaint in the United States District Court, Northern District of Illinois (No. 00 C 4737) against Defendant alleging discrimination in employment on the basis of national origin and retaliation pursuant to Title VII of the Civil Rights Act of 1964, as amended. On July 12, 2001, Szymanski filed another EEOC charge against Defendant alleging that Defendant subjected her to undue surveillance in order to "create a file" to cause her termination without cause on the bases of national origin, race, and retaliation for engaging in EEOC activity. On August 1, 2001, Szymanski filed an EEOC charge against Defendant alleging a continuing pattern of discrimination on the bases of national origin, race, and retaliation for engaging in EEOC activity. On December 17, 2001, Szymanski filed this instant action in this Court alleging a continuing pattern and practice of discrimination in employment on the basis of retaliation pursuant to Title VII.

On April 1-3, 2002, Szymanski's first federal lawsuit, case No. 00 C 4737, was tried by a jury before this Court. Following a verdict in favor of Defendant, Szymanski filed an appeal to the Seventh Circuit Court of Appeals. On April 8, 2002, Szymanski filed an EEOC charge against Defendant alleging she was suspended from her employment in retaliation of her EEOC activity. On April 24, 2002, Szymanski filed an EEOC charge against Defendant alleging that she was terminated in retaliation of her EEOC activity.

## III. Discussion

In the current case, Szymanski claims that Defendant retaliated against her for engaging in protected EEOC activity in violation of Title VII in an intentional and continuing fashion. Namely, Szymanski alleges that Defendant: was "creating a file" on her in order to discharge her; falsely accused her of failing to perform patient interviews; excluded her from an educational lecture and assigned her to see patients; denied her the use of a pager, voice mail, and a key to the administrative office; removed her from patient care duties to clean patient education files; excluded her from overtime; suspended her; and ultimately discharged her.

The Seventh Circuit recently clarified the proper standard for analyzing retaliation claims on summary judgment in Stone v. City of Indianapolis Pub. Utils. Div., 281 F.3d 640, 644 (7th Cir. 2002) by articulating two routes to summary judgment. Under the first route, a plaintiff may present direct evidence that she engaged in protected activity and that, as a result, she suffered some adverse employment action. Id. If the evidence is uncontradicted, plaintiff is entitled to summary judgment; if, however, the defendant presents unrebutted evidence that it would have taken the adverse action regardless of any retaliatory motive, the defendant is entitled to summary judgment. Id. Under the second route, which is the McDonnell Douglas indirect method, a plaintiff must show that (1) she engaged in protected activity; (2) she was subjected to adverse employment action; (3) she was performing her job in a satisfactory manner; and (4) she was treated less favorably than any other similarly situated employee who did not engage in such protected activity. Id.; see also Hilt-Dyson v. City of Chicago, 282 F.3d 456, 465 (7th Cir. 2002). If the plaintiff establishes a *prima facie case* of retaliation, the burden shifts to the employer to articulate a legitimate, noninvidious reason for the adverse action. Stone, 281 F.3d at 644; Hilt-

Dyson, 282 F.3d at 465. Under this McDonnell Douglas framework, the plaintiff "need not show even an attenuated causal link." Stone, 281 F.3d at 645. Once the defendant articulates a legitimate, noninvidious reason for the adverse action, the burden shifts back to the plaintiff to demonstrate the pretextual nature of the proffered reason. Hilt-Dyson, 282 F.3d at 465. At this point, if the plaintiff fails to establish pretext, then her retaliation claim cannot survive summary judgment. Id. The ultimate burden of persuasion always remains with the plaintiff. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-56 (1981).

Because Szymanski presents no direct evidence of retaliation, which is "evidence that establishes without resort to inferences from circumstantial evidence," Stone, 281 F.3d at 644, she must proceed under the second, burden-shifting method articulated in Stone. The Defendant argues that Szymanski cannot establish a *prima facie* case of retaliation. First, Defendant argues that the only actions that Szymanski has identified that qualify as adverse employment actions are her suspension and termination. Defendant argues that the other acts Szymanski identifies in her briefs--loss of overtime pay, removal from patient care duties, increased surveillance (i.e., "creating a file" on her), notice of disciplinary actions (including being falsely accused of failing to perform patient interviews), exclusion from lectures and training sessions, denial of pager, voice mail, and keys to the administration office--do not constitute adverse employment actions. Second, the Defendant argues that, while suspension and termination constitute adverse employment actions, Szymanski still fails to establish a *prima facie* case of retaliation because she cannot show that there was a causal link between her EEOC activity and any adverse action, or that she was treated differently from any similarly situated employee who did not engage in statutorily protected expression.

-14-

*Adverse Employment Actions*

As to Defendant's argument about adverse employment actions, this Court partially agrees. Two of the actions that Szymanski identifies as adverse employment actions are claims that she raised in her first federal lawsuit--loss of overtime pay and removal from patient care duties--and they therefore have been adjudicated. Szymanski attempts to relitigate these actions by arguing that, under her "continuing violation" theory, evidence of prior adverse actions is admissible to establish a pattern and practice of retaliatory animus and/or hostile work environment. The continuing violation theory, however, was not intended to be used to circumvent *res judicata*. Rather, the continuing violation theory "allows a plaintiff to get relief for a time-barred act by linking it with an act that is within the limitations period." Selan v. Kiley, 969 F.2d 560, 564 (7th Cir. 1992); see also E.E.O.C. v. Harvey L. Warner & Assocs., 91 F.3d 963, 969 (7th Cir. 1996) (quoting same). The purpose of this theory is to permit the inclusion of acts whose character as discriminatory acts was not apparent at the time they occurred." Speer v. Rand McNally & Co., 123 F.3d 658, 663-64 (7th Cir. 1997) (citations omitted); see also Place v. Abbott Labs., 215 F.3d 803, 807 (7th Cir. 2000). The statute of limitations is not an issue in this case, and all of the cases that Plaintiff cites are inapposite. Thus, Plaintiff may not argue these acts as proof of retaliation in this case.

As to Szymanski's other allegations--that Defendant increased surveillance on her (i.e., "creat[ed] a file" on her), gave her notice of disciplinary actions (including being falsely accused of failing to perform patient interviews), excluded her from lectures and training sessions, and denied her use of pager, voice mail, and keys to the administration office--while they do not individually constitute material adverse employment actions, see Smart v. Ball State Univ., 89

F.3d 437, 440 (7th Cir. 1996) (holding that "not everything that makes an employee unhappy is actionable)-- it is not clear that, in combination, they do not constitute material alterations of the conditions of her employment. See Oest v. Ill. Dept. of Corrections, 240 F.3d 605, 612 (7th Cir. 2001) (stating that a "materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, *or other indices that might be unique to a particular situation*") (emphasis added). Whether she can prove damage as a result of these actions is an entirely different matter, not involved in the instant motions.

*Causal Connection*

Defendant argues that even though Szymanski can show she suffered an adverse employment action in her suspension and termination from employment, she cannot show that there is a causal connection between her protected activity and the adverse employment actions. Under Stone, because Szymanski proceeds with the McDonnell Douglas indirect method to prove her retaliation claim, she does not need to establish a causal connection, see 281 F.3d at 645. It is unclear, however, whether Stone broke new ground or merely suggested another way of looking at the cases. Compare Fine v. Ryan Int'l Airlines, 305 F.3d 750, 751-52 (7th Cir. 2002) (requiring evidence of a causal link); Wells v. Unisource Worldwide Inc., 289 F.3d 1001, 1008 (7th Cir. 2002) (affirming summary judgment for employer where employee failed to establish a causal link between protected activity and an adverse employment action); Franzoni v. Hartmarx Corp., 300 F.3d 767, 772 (7th Cir. 2002) (same). Thus, it is not entirely clear whether a plaintiff must demonstrate a causal connection between her protected expression and the adverse employment action taken against her to survive summary judgment.

Luckily for this Court, there is no need to resolve this conundrum at this point because even if evidence of a causal link is required, Szymanski has produced enough evidence to create a genuine issue of material fact on that issue. Szymanski filed no less than seven EEOC charges against Defendant between January 2000 and April 24, 2002 and two federal lawsuits. Further, her jury trial for her first federal lawsuit commenced on April 1, 2002 and ended April 3, 2002, a mere five days before Szymanski was suspended. Given that Szymanski participated in a flurry of EEOC activity, and that her supervisors were well aware of that activity, this Court cannot say as a matter of law that there is no causal link between Szymanski's protected activity and her adverse employment actions.

## *Similarly Situated Employees*

Defendant also argues that Szymanski does not establish a *prima facie* case of retaliation because she fails to demonstrate that she was treated differently from any similarly situated employee who did not engage in statutorily protected expression because the requirement to secure a Collaborative Agreement applied to all Nurse Practitioners. Contrary to Defendant's argument, however, Szymanski has created genuine issues of fact on this issue. There is evidence in the record that Szymanski may have had a more difficult time in finding physicians who would agree to work with her as well as evidence that Dr. Raba and/or Dr. Win may have impeded her efforts in securing a Collaborative Agreement. Thus, this Court finds that Szymanski has established a *prima facie* case of retaliation.

## *Pretext*

Once Szymanski establishes a *prima facie* case of retaliation, the burden shifts to the employer to articulate a legitimate, noninvidious reason for the adverse action. Stone, 281 F.3d

at 644; Hilt-Dyson, 282 F.3d at 465. Defendant's reason for suspending and subsequently terminating Szymanski was that she was unable to satisfy the minimum requirements of the Nurse Practitioner position by failing to secure a Collaborative Agreement with a qualified Bureau Physician. Szymanski, however, has shown that a genuine issue of fact exists regarding whether Defendant's reason is pretextual. Szymanski asked no less than four physicians to be her collaborative physician, and all at least initially seemed interested until they discussed the matter with Dr. Raba and/or Dr. Win. Further, on April 23, 2002, Szymanski furnished a Collaborative Agreement signed by Dr. Harrison, which Dr. Raba rejected because Dr. Harrison does not work on site. Dr. Raba's reason for rejecting Dr. Harrison, however, was not made pursuant to the Bureau Policy but to the internal guidelines he created "sometime in March 2002." Because this Court finds that the record in this case is replete with material issues of fact regarding whether Defendant retaliated against Szymanski in firing her, both Plaintiff's and Defendant's motions for summary judgment are denied.

## IV. Conclusion

For the foregoing reasons, the Plaintiff's and Defendant's motions for summary judgment are DENIED in their entirety.

**Enter:**

_____

**David H. Coar**
**United States District Judge**

**Dated: November 8, 2002**